Ronald S. MILLER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 21967.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 25, 1969.

Decided May 8, 1969.

Mr. Branko Stupar, Washington, D. C., with whom Mr. Henry S. Turner, Washington, D. C., was on the brief, for appellant.

Mr. Leonard Schaitman, Attorney, Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., at the time the brief was filed, Messrs. David G. Bress, U. S. Atty., and John C. Eldridge, Attorney, Department of Justice, were on the brief, for appellee. Mr. Frank Q. Nebeker, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

FAHY, Senior Circuit Judge:

Appellant sued the United States under the Tucker Act, 28 U.S.C. § 1346 (a) (2), for $4,302.35. This amount was the face value of certain Military Payment Certificates which had been issued by the Department of the Army and which came into appellant's possession as a civilian employee of the United Services Organization at Seoul, Korea. His request that they be honored and converted to a usable new series of such Certificates had been refused by the Department of the Army. The case was heard by the District Court on the administrative record made within the Department, and on cross motions for summary judgment which raised no disputed issue of fact. Appellant's position was that on this record he was entitled to judgment as matter of law. The court disagreed, granted the motion of the

United States, and dismissed the complaint. We affirm.

Military Payment Certificates are issued by the Army for payment to and use by its personnel and other authorized persons as a medium of exchange in substitution for dollars or local currency in certain overseas countries where United States military forces and establishments are located.[1] Appellant was an authorized person.[2] Such Certificates have been in use for more than twenty years as a means of protecting the local currency and thereby the economy of the overseas country, and, also, to prevent black market operations in American dollars and American goods available at United States Military establishments.[3]

An essential part of the system, carried out under regulations of the Army, permits outstanding Certificates to be withdrawn from circulation from time to time without warning, to be replaced by a new series to which Certificates of the previous series can be converted by the finance officers. The conversion takes place on the same withdrawal day previously unannounced. In Korea Certificates worth $300.00 could be converted into a new series without question at times relevant to this case, that amount being deemed normal for personal needs.[4] If Certificates representing an excessive amount were presented conversion would be permitted "only when their legitimate acquisition is verified by a preponderance of evidence."[5] The regulations provide administrative proceedings to give an authorized person an opportunity to establish lawful acquisition of amounts in excess of those deemed normal, including acquisition from other authorized personnel. The method of handling the matter thus outlined results in loss of Certificates by unauthorized holders and discourages illegal traffic in Certificates.

On January 6, 1964, the then outstanding Korean Series No. 591 was replaced by a new Series No. 611. On the conversion day appellant applied for conversion of $5,825.35 worth of Series No. 591 Certificates, substantially in excess of the normal amount readily convertible. Accordingly appellant was required under the regulations to establish legitimate acquisition of the excess. In lengthy administrative proceedings which ensued he was found to have established legitimate acquisition of Certificates worth only $1,523.00, leaving unconverted Series No. 591 Certificates of $4,302.35, the amount for which he sued the United States in the District Court.

The converted amount of $1,523.00 was arrived at as follows: When Series No. 591 was initiated appellant converted $750.00 worth of a prior series. Thereafter and until January 6, 1964, the date of issuance of Series No. 611, he earned

1. The system is governed by Army Regulations 37–103 (C10, AR 37–103, Ch. 12), entitled "Foreign Financial Operations," supplemented by additional local regulations, herein Eighth United States Army Regulations 35–243 (EUSA 35–243).

2. *c. Authorized Personnel.* For the purpose of chapter authorized personnel include—
 * * * * *
 7. Civilians * * * who are employed by quasi official organizations * * * when authorized by appropriate oversea commander. Examples of quasi official organizations are * * * USO. * * *
 C10, AR 37–103, ¶ 12–3c.
 Korea is within the jurisdiction of the Eighth Army. MPCs issued to authorized personnel stationed there are further subject to Eighth Army regulations. *See* note 1, *supra.* Each Certificate contains the following printed statement:
 FOR USE ONLY IN UNITED STATES MILITARY ESTABLISHMENTS BY UNITED STATES AUTHORIZED PERSONNEL IN ACCORDANCE WITH APPLICABLE RULES AND REGULATIONS.

3. This function, among others, was anticipated by Congress when it first considered enabling legislation which appears as 58 Stat. 921 (1944), as amended, 31 U.S.C. §§ 492a, 492b, 492c. *See* H.Rep.No. 1945, 78th Cong., 2d Sess. (1944); S. Rep.No. 1311, 78th Cong., 2d Sess. (1944).

4. EUSA 35–243, ¶ 5e.

5. EUSA 35–243, ¶ 5e. *See also* C10, AR 37–103, ¶ 12–41.

$11,140.00. Thus he was credited without question with legal acquisition of $11,890.00 worth of Certificates. Based on his own data his expenses during the same period were $10,367.00. Subtracting this from the $11,890.00 leaves the $1,523.00 he was ·permitted to convert to Series No. 611. As to the remaining $4,302.35 appellant at different times advanced various explanations concerning their acquisition, leading in the end to his most plausible factual position that they were gains in his gambling and related activities, as to which there was considerable evidence. There was no evidence, however, that any of the excess Certificates were acquired in this or in any other manner from authorized persons.

From the foregoing it will appear that if appellant was validly required to establish by a preponderance of evidence that he had acquired the disallowed Certificates in a lawful manner the decision of the Department of the Army, acting through its Comptroller, that he had not done so was properly upheld by the District Court; that is to say, the United States did not owe appellant the $4,302.-35 he claimed.

Appellant does not dispute the general validity of the Certificate system; nor does he dispute that the regulations place upon him the burden of proving authorized acquisition of an excessive amount. His position is that placing this burden upon him deprived him of property without due process of law. He would support this position in part by urging that possession and exercise of ownership were proof enough of legitimate ownership absent rebuttal evidence by the United States. He adds that the result which has eventuated constitutes a taking of his property without just compensation in violation of the Fifth Amendment.

 If there is a general rule of evidence, such as appellant suggests, that possession and ownership carry a presumption of lawful acquisition of property, we think such a rule does not apply to the particular situation before us. The face of the Certificates, *see* note 2, *supra,* warns the holder that their possession and use are governed by applicable rules and regulations. Moreover, appellant, while not contending against the Certificate system, advances a position under which it could not survive. If the United States were required to honor Certificates without regard to whether the holder was an authorized person, or without regard to whether he acquired them from authorized persons, the system would fall apart. It would be altogether inconsistent with the system were an authorized person permitted to be a conduit by which to obtain conversion or create value for unauthorized persons. So much seems clear. It is equally clear, it seems to the court, that it is reasonable—and, therefore, in this context, consistent with due process of law—for the regulations to place upon the holder of an excessive amount of Certificates the burden of establishing lawful ownership, that is, in this case acquisition from authorized personnel. The Army itself would not know from whom excess Certificates were acquired. The possessor or owner would know and easily could account for their source. A similar sort of accounting is required, for example, in the familiar case of income tax returns. One knows the source of one's income and can be required to state it. In the present case it is not merely that the gambling or other source of the Certificates did not itself establish legitimacy, but no substantial evidence of legitimacy, in terms of a source from authorized personnel, was advanced by appellant. Were authorized personnel able to obtain conversion of all Certificates their possession of which might derive from any source whatever, the restriction upon the use of the Certificates to authorized persons could not be made effective.

A rule of evidence which places upon one who would recover from another the burden of proving facts essential to validity of the claim, where such facts are peculiarly within his knowledge, is not uncommon. *See* United States v. N. Y.,

N. H. & H. R. R. Co., 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 2 L.Ed.2d 247; United States v. Denver & Rio Grande R. R. Co., 191 U.S. 84, 24 S.Ct. 33, 48 L.Ed. 106; Tendler v. Jaffe, 92 U.S.App.D.C. 2, 203 F.2d 14. *See, also,* United States v. Donruss Co., 393 U.S. 297, 305–306, 89 S.Ct. 501, 21 L.Ed.2d 495. We are aware of no decision that such a rule is inconsistent with due process of law.

As to appellant's further argument that there has been a taking of his property without compensation in violation of the Fifth Amendment, he relies upon Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. We think the situation in *Lynch* is substantially different from that which concerns us now. There the Supreme Court held that the authorization of renewable term insurance under the War Risk Insurance Act[6] for those who served in the armed forces during World War I and their dependents were contracts which could not be legislatively repudiated consistently with the compensation provisions of the Fifth Amendment: "To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation," said the Court.[7] In appellant's case, however, the obligation of the United States was conditioned by the regulations applicable to the Certificates. This is part of financial arrangements made with authorized personnel in areas where the United States properly has initiated measures to protect not only its personnel but the currency and economy of the nation in which our armed services and related establishments are operating. Appellant has not met the terms of the arrangements thus validly initiated.[8] The consequence is not the taking of a property right but the denial of recovery for failure to establish a valid claim.

Affirmed.

6. Act of Oct. 6, 1917, ch. 105, §§ 400–405, 40 Stat. 398.

7. 292 U.S. at 580, 54 S.Ct. at 844.

8. *Cf.* Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 278–281, 89 S.Ct. 518, 21 L.Ed.2d 474.